Good morning. May it please the Court, my name is Ryan Dykes. I represent Stanley Drew, the appellant in this matter. The trial court dismissed Mr. Drew's complaint after he missed a discovery deadline. And the issue before the Court today is whether it was proper for the district court to do that. There is a long line of cases in this circuit that deals with when it is appropriate for a district court to exercise that extreme sanction of dismissal. And as I understand it, there are five factors. And the standard that is followed in this circuit is that if four of those factors favor dismissal, then the dismissal will be affirmed on appeal. Or if three of the factors strongly favor dismissal. Well, some of the factors automatically always point in one direction, so that doesn't... Well, I mean, there could be arguably something that, I mean, you know, essentially what... Courts are not required, to my understanding, to do progressive discipline, as it were, correct? Right. So, I mean, you look at those five factors and you evaluate it. So arguably, you know, what I would call a dismissal is going zero to five hundred... zero to 106 seconds or something along those lines. But there could be conduct that would be so egregious where that could be appropriate. I think we would all... and it would meet... it would work out in the balance. And so it's going to be... but the standard that we have is also abuse of discretion, correct? That is correct, Your Honor. I guess the question that is... that, you know, when we look at abuse of discretion, I mean, the trial judges are the ones down there in the... you know, in the trenches that are working with the cases for a long period of time. They have to, you know, they have to manage their calendar. And I know this will come as a surprise to everyone in the courtroom, but attorneys sometimes aren't easy to manage. And so, you know, courts aren't required to be paper tigers in the sense that, you know, we have to threaten you five times or say, you know, next time I'm really going to do it or anything along those lines. And what I'm curious about, yes, here, dismissal is... it's harsh and it was missing a deadline. But I'm curious about the backdrop of this case from the standpoint that it's an attorney malpractice, a legal malpractice case, right? That's correct, Your Honor. And so correct me if I'm wrong. In some... yeah, I mean, the things that we have that seem to be of irritation to the court on some level is that Mr. Drew is... that the accusations that he's avoiding having his deposition taken, you know, that he's being obstreperous along those lines. And then there's the expert. Now, isn't it pretty normal if you're going to have a legal malpractice case? I mean, you have to show that it fell below the standard of care, right? Correct. So you would have consulted, you know, it would seem logical that you would have to have some expert information available anyway to go forward with that type of case. So I'm struggling with why, you know, it seems to me looking at this, if I'm trying to see through it, the district court thought that you were sandbagging and just had it and snapped at that point. Well, Your Honor, let me address that. I think that fairly read, the order and opinion that the district court issued here doesn't really refer very much at all to the depositions. The thing that seemed to irritate the court the most was that we missed a deadline, and it was 35 days past the deadline when we got the expert report in. To go back to the background here, you're absolutely correct. You do need to establish a standard of care in a legal malpractice case, and we did have an expert who had been identified and who had been, who had promised to be the expert in this case. But he wanted, before he was able to, before he wanted to do his, issue his opinion on this, he wanted to hear and read the depositions of the principal parties. Those depositions were scheduled in the spring of 2005. Various things happened on both sides that prevented those depositions from taking place, one of which was the defendants said they were going to bring their folks from out of town for Mr. Drew's deposition. And we said, fine, we will depose them all at the same time. And that would have given us time to give those depositions to the expert that had been identified at that point. At the last minute, the defendant said, no, we're not going to bring our folks. Well, that put us in a bind. We had a deadline coming up, and we had an expert who did not want to opine until he had read those depositions. So we went out and got another expert. Okay, but the one that you got, wasn't that the one that had to do with the settlement previously? Well, he had drafted the settlement agreement. That is correct, Your Honor. All right. Could that person even be an expert in this action? Sure. Or was that just a placeholder? It seems like there could be sort of a conflict. Well, you know, I can understand, and I certainly think the defendants have certainly played on that, but I think you have to understand what he was coming in to say. On the underlying case, which was tried in Illinois, the Illinois court considered a California agreement that was made in California by California parties. I'm not sure how it got to Illinois, but what Mr. Handel was going to opine was this. When the defendants represented Mr. Drew in the Illinois court, they did not tell the Illinois court how California law applied and how it interpreted this agreement. And as a result, the Illinois court applied its own law, reached a decision that was different than what would have been reached in California. So I don't think that Mr. Handel was disqualified from offering an opinion along those lines. The fact that he had drafted the agreement I don't think disqualifies him. It might go to the weight that a jury would give to his testimony, but I don't think it would go to the ---- From your perspective, what sort of warning did you get that this was coming? Well, here's what happened. I mean in terms of sort of the ---- Sure. It's sort of like if I say to you, okay, do this, and, you know, I'm promising you this is what's going to happen to you. Sure. Well, here's what happened. We missed the deadline on May the 27th, 2005. We immediately contacted opposing counsel and said we missed the deadline. We recognize that. We will work as quickly as we can to remedy that. They filed a motion for a scheduling order or a scheduling conference, which was held on the 30th of June, 2005. And at that scheduling conference, the judge said this. He said, well, there's various ways that we can go here. He said I can, to deal with this missed deadline, you folks, the attorneys, can reach an agreement to just extend the scheduling order deadlines to take account of this delay. Or I can strike the expert's report, or he said that you can show me, Mr. Porter, at the time, that you had good cause, you have good cause for extending the deadline here. And if none of those things work, then a dismissal may occur. Well, we couldn't control the first one. We said, and we did, we gave the other side a proposed new discovery schedule that would have accounted for this delay. They were not willing to do that. The other one was striking the expert opinion would end the case for the reasons you've already stated, Your Honor, need to have a standard of care witness. And the third one was this good cause. Well, what we did, and much has been made in the briefs that we did not file a motion to extend or to alter or modify the scheduling order. We did not file a separate motion to do that. But right after the June 30th hearing, we filed our expert report. The other side filed a motion to dismiss, followed by a motion for summary judgment. In responding to their motion to dismiss, we told them exactly all the facts that we had about how we had missed the deadline, and they are essentially what I've told you earlier today. So when did you first realize you'd missed the deadline? Right after. It was within a day or two after the deadline had passed, and that's why we contacted opposing counsel immediately. And so that's, to answer your question, that was the warning we got. And we looked at it and we said, well, we will tell the court. We'll give them all the facts we have. We're not going to try to hide anything here. We did miss a deadline. And we will give that to them, and the court. So it's not only that you didn't miss a deadline, you really didn't have an expert either. I mean, so you kind of knew that was going on. So was no one just thinking about this coming up, or what's your explanation in the record on that? The explanation in the record, Your Honor, is that we did have Mr. Handel as a substitute witness, but we weren't able to get him to get an opinion because he was out of the country at the time. And that's how the deadline was missed. We realized after we talked to him that, well, the deadline's come and gone. We can't get him. He's in China. Is anyone going to say that, okay, you know you have to have an expert in this type of case, and it had been going on for a while, and if you don't even have an expert, that sort of means that you can't really go any further, and that this is just a vexatious, and, you know, you're tying these people up when you don't even have anyone that can say they fell below the standard of care. Is your question whether somebody will say that? Yes. Well, yeah, they've already said that. But we do have an expert, and we did have an expert at the time. He was, you know, his opinion was disclosed late. There's no doubt about it. It was 35 days late. So let's say if the judge believed that you were just, you know, perpetuating a lawsuit that you didn't even have an expert to say that it fell below the standard of care. So the judge was viewing it, not only did you miss a deadline, but really you don't have, you know, it really there's just nothing here that can go forward. Would that, if the judge believed that, is that justified dismissing it at that point? I don't believe so, Your Honor. I think that would be something that would be handled via a motion for summary judgment. Well, I guess how long, but how long can you keep going on something when you don't even have someone that says you can fall below, that you fall below the standard, you know, that you can really make a case? How long would it have been going on? Well, I don't think that's, I think that's a question that isn't presented here. It hadn't been going on very long. We've got a 35-day delay. Okay, but how long had the lawsuit been going on? Well, the lawsuit had been going on since 2003. Okay. But there was still no one that had come forward to say this falls below the standard of care? For the reasons I've told you, Your Honor, that's right. As of May 27th, we, the first witness that we had contacted said, I don't want to give an opinion until I've read the depositions of the principal parties here. We have, it wasn't that we didn't have an expert and that he wasn't willing to opine, but he wasn't in a condition to render that opinion yet. So I don't think that the, I don't think in answer to your question, I don't think the court could look back there and say, you know what, I just don't think you have an expert and so I'm going to dismiss the case. I don't think he could. I think this court would overrule that. Well, you know, you're in a tough position. You know, the standard of review is we have to have a firm and definite conviction that Judge Sedgwick went beyond the range of acceptable sanctions. It's pretty hard for you to show that. And you look at the record in this case, it began in 03, there was a substitution of judge, but it dragged on and you did nothing. And what the expert was going to testify to was a very narrow point. He didn't need to see a lot of depositions if he was going to testify about California law in an Illinois court. It was pretty small. So you're doing the best you can, but let me just tell you, you haven't moved, changed my opinion one bit. Well, Your Honor, I'm sorry that I haven't. Well, try, if you want to try again. I'm going to carry on for at least a couple more minutes. Well, I think it's close in the sense that it's not a long, you know, we're talking that you've got the strength is 35 days, but I'm just, when you're looking at the five factors and you're looking at abuse of discretion, I think all of us have concern. I mean, any appellate judge has concern on abuse of discretion of substituting your own judgment for the judgment of the trial judge. But that's, so that's where we need your convincing there. Because it's got to be really over the top. Well, here's what I would like you to focus on then. We've kind of covered the background here. What I would urge you to focus on is what Judge Schroeder focused on in her dissent in the Pag-Tulumen case, which is prejudice. Where is the prejudice here to the defendants? And there wasn't any prejudice. When we come down to the very, at the very end of this thing, and I understand all of the abuse of discretion standard, and I understand the difficult position I'm in. But when we look at this, what harm was there? And what are we, what is the objective that we're trying to reach by levying sanctions in the first place? If the objective we're trying to reach is to just get cases out of court, well, then I guess the court did the right thing, because he got this case out of court. But if we're trying to be fair to all the people, then we need to look at things like prejudice. And in this case. Well, can we consider, is prejudice, you know, when you're accused of legal malpractice or medical malpractice and you're continuing to work in the field, isn't something like that a little bit of a cloud on your reputation and lawyers count on their reputation, so extending something out? Yes, Your Honor. Is it a little more than just, you know. Well, Your Honor, yes. I understand that point, and I'm not going to take issue with that. But what I'm saying is in this case, this is an unusual case. The case was dismissed. Before it was dismissed, the court said, go ahead and take more time, defendants, if you need to. If you've got a problem here, go ahead and take more time. They said, no, we don't want to take any more time. We want to focus right here on this dismissal. We want the case dismissed. So it wasn't like they were being prevented from going to trial or getting prepared for trial or this delay really had any material impact on their preparation for trial. Later, the case, the dismissal order was vacated, and the case was resurrected. And then new deadlines were put in place, which would have pushed the trial at the very least into the latter part of 2006. So if your expert was going to need depositions, then why didn't you set it up that way? Why didn't you get an expert and know what they wanted? I mean, I just don't understand how you managed the case. Well, we did, Your Honor, and I guess I wasn't clear on that. We did that. During the spring of, or before the spring of 2005, our expert said, yes, I will opine, but I want to have the depositions. We set up the depositions, but they didn't happen. There was a death in the family of one of the parties. There was some other wrangling between the counsel. There were some other difficulties in getting those depositions done, Your Honor. Maybe I missed this, but what was the lesser, because I understand that the Court did consider striking the expert's report as a lesser sanction, but that that would really. That's a death knell, too, right? That's the end of the case as well. It is. We're done. So what, so I guess I'm. Well, that was our problem as well, Your Honor. We said, what do we do here? We want to correct. We realize we violated the scheduling order. We want to fix it. What would you have us do? Do you want us to pay money because there's been some delay? Do you want us to maybe curtail some of our discovery? Did you file a motion saying that? We didn't file a motion saying that. You did? No, we did not. We filed a response to the motion to dismiss saying, here's, well, we tried to establish what cause we had for missing the deadline. And the judge says that's not compelling. But that was our effort to tell the judge or to respond to one of his invitations. His invitation was either make an agreement and move these deadlines down the road or I dismiss the, the, I mean, I strike the expert's report or you show me good cause for extending the deadlines. Has this been a contentious lawsuit? I would say to some degree, yes. It's been more contentious probably than the issues merit. I would like to reserve my remaining time. You may. Thank you. Your Honor, it's Todd McCann on behalf of the appellees. When appellant's Illinois case went up to the Seventh Circuit, the Seventh Circuit opinion called it an easy case. I would submit that this is likewise an easy case. Mr. Dykes represented and noted the Pag-Tulunian dissent of which Judge Schroeder was involved. And there's also a couple other cases cited that Judge Noonan was involved in, the Payne case and the Henry case. All those cases emphasize that the trial court's dismissal is a weighing of the two key factors, the prejudice and the lack of less drastic alternative sanctions. Well, this is harsh, though. This is harsh. I mean, you can't get any harsher. It is. And there wasn't a progressive thing going on. So I guess part of it would be why wouldn't anything less have worked and why, you know, why should we go from zero to 106 seconds? Well, I guess in follow-up to your point that what you need to do is look at the order and opinion to see what Judge Sedgwick did and whether Judge Sedgwick weighed the factor of prejudice and whether Judge Sedgwick weighed the factor of less drastic sanctions, less drastic alternatives. The order of opinion clearly did that. And I would submit the order and opinion modeled itself after the Pag-Tolunian dissent, because it touched on the fact that three of the factors are sort of a foregone conclusion, that the first two factors weigh in favor of affirming the dismissal. The public policy in favor of trying the case on the merits weighs in favor of reversing. So the key factors are the prejudice and the lack of address. You know, it's easy to fall into the habit of thinking of that as five factors that have to be met. But really, as the Court has said more than once, that's a way of a — it's a shorthand. It's the total gestalt that counts. And so, although I understand why counsel on both sides go through it, you really want to say the Court gets — the trial judge gets the big picture. And it helps if he spells it out. But it doesn't have to be you meet this, you meet this, you meet that, you don't meet that. It's the overall thing that counts. And that's why we're very hesitant to overrule the trial judge. He's seen the whole picture, this doubtful expert and so forth, the long delays. Well, anyway, I'm just telling you that you're being meticulous, but you may not have to be too meticulous. I'll move along. You need to give us the big picture about what Mr. Drew did. I mean, should Mr. Drew — if the whole thing is that his attorneys missed a filing, you know, 35 days or in the filing. Right. Should he not have his stay in court? Is he being punished for his lawyers? Or is — how does Mr. Drew play into all of this? I don't think so. I mean, the cases, the Henderson case, the Chisholm case, say that a litigant has the freedom to select its counsel and will not be heard to not have to abide by the misdoings of its counsel. And this is not a 35-day, one-miss-deadline case. I mean, we've noted at Record 50 that the parties filed a case management plan report in anticipation of Rule 16 Case Management Conference. That case management report was filed on September 30th of 2004. We have submitted the transcript of the Rule 16 Case Management Conference that was held as Record 56. At that time, plaintiff's counsel advised the court that he had his expert lined up. The court noted there was a lack of clarity in plaintiff's theories, making it difficult for a defendant to defend the case. The court instructed plaintiff to diligently move the case along. It was 16 months old at that point. Thereafter, plaintiff did next to nothing. We have a letter that plaintiff has submitted to its excerpts of record as 116 that lays out in January and February of 05, we made attempts to find what Mr. Drew's availability would be for deposition to no avail. In March, we were finally advised that he could be available at the end of March, so we noticed up his deposition, but didn't get confirmation that he would actually show up until the 22nd of March. And by that time, the Chicago lawyers who had agreed to try to be available if Mr. Drew was going to be available, there was never a notice of any of the defendants. Their schedules were then full. We tried to get a deposition the following week, and then Mr. Drew was unavailable for that. We noticed that deposition, and then we were told that Mr. Drew was not going to be available for six weeks after that because he was going to be out of town. We noticed the deposition again for near the end of May, and due to the untimely death in his family, he was unable to make that as well. Four days after that, he missed his expert deadline. Six days after that, we said, when is he going to be available? We didn't hear anything at all. And then finally, with our expert deadline approaching, we filed for a Rule 16 conference, at which time the court advised and noted on the record that the parties would be filing motions. Ours would be based on the fact that plaintiff didn't have an expert. Plaintiffs would be based on the fact that they'd be trying to extend the deadline to be able to timely disclose an expert. As we know, for whatever reason, plaintiff never filed that motion. We filed, and we actually filed three motions, the motion to dismiss, the motion to strike expert, and the motion for summary judgment, all roads leading back to Rome that plaintiff didn't have an expert in a legal malpractice case. Now, two years after it had been filed, plaintiff didn't even respond to the motion to strike expert. Plaintiff notes that it didn't file the requisite motion for good cause, that it just responded to our motions, but even in its responses, it didn't try to analyze or provide any good cause support. And now in its appellate filings, it concedes the fact that it didn't have good cause. So at that point, plaintiff was left without an expert. The court could have either chosen to strike the expert. In terms of the less drastic alternative sanctions, there's three factors, I believe, in the Malone case and also referenced in the Pantelunian case, that the court needs to weigh an alternative sanction. And show that it's wanting, obviously, it looked at the possibility of striking the expert, but striking the expert is, in essence, dismissal of the case, giving some sort of a warning before dismissal. Mr. Dykes conceded that he was aware at the June 30, 2005, status conference that the dismissal was a possibility. And then also, I forget the third factor, the court did that as well. I think the court painstakingly and methodically went through the third factor in addressing alternative sanctions, is that the court provide plaintiff with an opportunity to cure the malfeasance. The court did so. The court didn't dismiss the case right away. Well, what could they do to cure? Come and talk to you and get your, I mean, you wouldn't agree to that. I mean, that's sort of like saying, okay, if you can get them to agree so that I won't dismiss it, you know. I mean, I think that's a little bit hollow there. Well, that is, but the permission to file a belated motion to modify or extend the scheduling order for good cause, I don't think was hollow. And the court did give plaintiff the opportunity to belatedly file a motion for good cause to modify or extend the scheduling order after already having missed the deadline. And plaintiff stated on the record that he would do so, and then he didn't. Okay. Did he ever present prior to the dismissal, did the court ever see the expert, you know, either that they actually had the opinion of the expert? You know, there was never any motion for leave, motion to submit a belated expert report. There was just an expert report submitted. So I would submit that that was of no legal effect without the court's blessing and an order extending the timing. Well, but at least it was done, I guess, at that point. I mean, he could argue, if I'm going to make his argument, so at least it finally got them off the dime and they got it done. Well, they got it done, and then the understanding on the record of the June 30, 2005, scheduling conference was that plaintiff would come forth and file a motion to get leave of court, to have belatedly submitted the expert report, and then over three months went by with no such motion being filed. But you have a double, so in essence you're saying there was a double failure here. I think there was a double failure. And I guess just briefly on the issue of the defendant's counterclaim, that was a voluntary dismissal. It was a voluntary dismissal under Rule 41A. It wasn't an involuntary dismissal under Rule 41B. Thus the five factors don't apply. I think the record and all the filings are clear that the only thing in play was the defendant's counterclaim subsequent to the dismissal of the plaintiff's claim. So I, unless you have questions, I think I'll pass back to Mr. Dykes. Are there any questions? Don't appear to be any. Okay, thank you. In the brief time that's remaining, let me just correct a couple of things. I may have misspoken. Mr. Handel did give an opinion, and it was delivered to everybody, and he opined that the defendants had fallen below the standard of care. If I didn't say that earlier, I meant to. Can I ask you about your telling the court in December of 2004 that you had an expert? Yes, we did. We did tell him we had an expert, and we did. He just hadn't given an opinion yet. What's that? It was the same expert? I told you we had two experts. We had the original expert in December of 2004. That's correct, Your Honor. And one other factual issue here, or perhaps a factual issue, is the accusation that we did nothing after the case management conference. But I think what was not said was that at that time the case was reassigned. Judge Wake recused himself, and so for a while we didn't have a judge and really couldn't do anything at that point. I only have a little bit of time left, and I just want to address something very quickly with you, because it's come up several times in your questions. I know that you know the case, and you know our positions on this. But we talked a lot about the big picture, and here is the big picture. If there had been no discovery infraction, there would have been no dismissal here. It wouldn't have happened. It was the discovery deadline that was missed that caused the dismissal. Well, it's true that the discovery, without the discovery miss, there would have been no dismissal, because there would have been no reason for the court to say give me a good excuse for why this was so late. Right. I'm just saying, what I'm trying to address, I'm sorry, Your Honor, I didn't mean to ask of you. No, I just, but I just, it's also true, isn't it? I just want to make sure I understand the picture, that having missed the discovery deadline, which could be for all kinds of reasons, that you were given an opportunity to explain what it was, and there was a, and that wasn't done, what the reason was, and that wasn't done either. Is that? Well, no, Your Honor. I guess we haven't been very clear, or I haven't been clear. I apologize. We did come back and we tried to tell the judge, here's the cause we have for missing the deadline, and why we'd like to have the deadline extended. We said that in a response to the motion to dismiss. But the court said, well, that's. Why didn't you move to get the record in, to change the deadline retroactively? In retrospect, we probably should have done that. But we wouldn't have said anything different, Your Honor, than what we said in the response to the motion to dismiss. And the court said, that's not enough. It's not enough to keep me from dismissing. It wouldn't be enough to extend the deadline for the same reason. So we feel like the, my last point is this. There, the judge did not explore alternative sanctions that we could have done something about. And I think he, under the case law here, in the big picture, that's what he's required to do. Dismissal is a drastic sanction, which this circuit. Okay. I just want to finish off with, I only have a few seconds here, that it's a drastic sanction which should be employed only in extreme circumstances. That's in the Hamilton-Copper case. And I don't think that here we have circumstances that are extreme. We don't have any willful, deliberate, or flagrant disregard of the rules. It was just an error. Thank you. Thank you. You're in the red, but thank you for concluding. I apologize. The case just argued is submitted for decision. Let's, we'll hear the next case for argument, which is McKenzie v. Deed.
judges: Schroeder, Noonan, Callahan